UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------x
                                              :
UNITED STATES OF AMERICA                      :
ex rel. JOHN and JANE DOE,                    :
                                              :
              Plaintiff/Relators,             :
                                              :
      -against-                               :
                                              :
THE TACONIC HILLS CENTRAL                     :
SCHOOL DISTRICT, et al.,                      :
                                              :
              Defendants.                     :
                                              :
--------------------------------------------------x
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILE
DOC #: _____
DATE FILED: March 25, 2014

11 Civ. 2699 (PAC)

**OPINION AND ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Relators John and Jane Doe ("Relators") bring this action against Defendants The Taconic Hills Central School District, The Auburn Enlarged City School District, The Mexico Central School District, The Greene Central School District (collectively, "Upstate Defendants"), and The New York City Department of Education ("DOE") (collectively, "Defendants") alleging that Defendants violated the False Claims Act (the "FCA"), 31 U.S.C. § 3729, et seq., by submitting fraudulent claims to Medicaid for case management services provided to disabled children when Defendants already received funding for those services under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq.  Individually, the Upstate Defendants move to dismiss the Amended Complaint for improper venue and, alternatively, to transfer the cases to the Northern District of New York.  The DOE moves to dismiss, in part, for failure to state a claim upon which relief may be granted.

The Upstate Defendants' motions are GRANTED and the DOE's motion is GRANTED. The claims against the Upstate Defendants are dismissed for improper venue, and the claims against the DOE for failure to state a claim.  Since Relators fail to state a claim upon which relief

1

may be granted against the DOE and their claims against the Upstate Defendants are almost identical, transferring the claims against the Upstate Defendants would not be in the interest of justice.  Pursuant to 28 U.S.C. § 1406(a), the Court declines to transfer the claims against the Upstate Defendants to the Northern District of New York.

## BACKGROUND

### I.      Statutory and Regulatory Background

#### A.      Special Education Programs

Congress enacted IDEA to ensure that "all children with disabilities have available to them a free and appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A); *see* N.Y. Educ. Law § 4402(2)(a).  New York school districts work to fulfill the IDEA's mission by providing special education services to public school students.  *See* N.Y. Educ. Law § 4402(2)(a).

The IDEA and state law require schools to develop Individualized Education Programs ("IEPs") for special-needs students.  *See* 34 C.F.R. § 300.320; N.Y. Educ. Law § 4402(3); 8 N.Y.C.R.R. § 200.4(b).  Developed during meetings of the Committee on Special Education ("CSE"), IEPs are written plans detailing the programs and services to "be provided to enable the child [t]o advance appropriately toward attaining the annual goals" for academic achievement and functional performance.  34 C.F.R. § 300.320(a)(4)(i); *see* 8 N.Y.C.R.R. § 200.4(b).  The development of an IEP is based on information provided by parents, school district representatives, and teachers, evaluations conducted by healthcare professionals, and a review of school records and tests.  *See* N.Y. Educ. Law § 4402(3); 8 N.Y.C.R.R. § 200.4(b).

2

**B.     Federal Funding**

For services rendered prior to July 1, 2010, New York State school districts receive federal funding for special education programs in two ways.  First, New York State agencies receive federal grants under the IDEA, *see* 20 U.S.C. § 1411(a)(1); 34 C.F.R. § 300.700(a); *see also* Declaration of Robert W. Sadowski ("Sadowski Decl."), ECF No. 72, Ex. B, and distribute the funds to public school districts for development of special education services, *see* 20 U.S.C. § 1411(f)(1); 34 C.F.R. § 300.202(a).  In order to receive these funds, school districts submit applications to the New York State Education Department ("SED").  A school district can use IDEA funds for "related case management activities of teachers and related services personnel providing services described in the IEP of children with disabilities, that is needed for the implementation of those case management activities."  34 C.F.R. § 208(b).  For example, SED's application lists expenditures related to IEP meetings and IEP team coordinator costs as allowable uses of IDEA funding.  *See* Sadowski Decl., Ex. C at 19, 21.

Second, Title XIX of the Social Security Act (the "Medicaid Act"), 42 U.S.C. § 1396, *et seq.*, provides federal funds to participating states for Targeted Case Management ("TCM") services furnished to Medicaid-eligible disabled school children.  *See id.* § 1396b(c).  The Centers for Medicare & Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services, administers the Medicaid program in partnership with state agencies.  On January 21, 1988, CMS approved the New York State Plan Amendment (SPA) No. 96-41, *see* Declaration of Christopher P. Langlois ("Langlois Decl."), ECF No. 44, Ex. C, which created the School Supportive Health Services Program ("SSHSP") and went into effect on October 3, 1996.  The New York Department of Health ("DOH") and SED jointly

3

administer SSHSP to assist New York State school districts in obtaining Medicaid reimbursement for TCM services.

The SED issues a handbook that describes the type and scope of TCM services covered by Medicaid (the "SSHSP Handbook").  For services rendered between January 1, 2000 and July 1, 2010, the SSHSP Handbook provided the following billing codes, among others:  5491 (Initial Review), 5492 (Annual Review), 5493 (Triennial Review), 5494 (Amended/Requested Review), and 5495 (Ongoing Service Coordination).  *See* Langlois Decl., Ex. E; *see id.*, Ex. D.  The SSHSP Billing Handbook defines the services for codes 5491-5494 as the "activities leading up to and including the writing of the IEP" and "conducting and convening the CSE conference to develop the IEP."  *Id.*, Ex. E at 30; *see id.*, Ex. D at 20-21.  In contrast, services billed under code 5495 are rendered subsequent to implementing a student's IEP and must include at least two contacts per month by a service coordinator relating to the student's ongoing needs.  *Id.*, Ex. E at 32; *see id.*, Ex. D at 22.  The DOE is not permitted to use code 5495 and therefore is unable to receive federal funding for ongoing service coordination activities.  *Id.*, Ex. E at 33.  In order to bill Medicaid for TCM services, a school district must submit an annual Certification Statement for Provider Billing Medicaid, which certifies that it provided these services in compliance with all applicable federal and state laws and regulations.

On July 30, 2009, SED issued a Medicaid in Education Alert to all SSHSP Medicaid providers.  *See id.*, Ex. J.  According to the release, pursuant to a settlement the State reached with the Federal government concerning audits of SSHSP programs in certain districts, schools would no longer be allowed to submit claims for TCM services with a service date of July 1, 2009, or later.  Pursuant to New York State Plan Amendment (SPA) No. 10-35, billing for TCM services was terminated on July 1, 2010 and New York State Plan Amendment (SPA) No. 96-41

was rescinded.  *See id.*, Exs. K & L.  Schools were permitted to bill for services provided prior to July 1, 2010, however, despite the 2009 moratorium on billing.  *See id.*, Ex. L.  The State subsequently altered the types of TCM services eligible for Medicaid reimbursement.  *See generally id.*, Ex. M.

## II.    Relators' Allegations

Relators are the parents of one of the school-aged children with disabilities who became aware of Defendants' Medicaid billing.  *See* Amended Complaint ("Am. Compl.") ¶ 10. ECF No. 9.  Relators allege that Defendants submitted false and fraudulent claims to Medicaid for TCM services that were not rendered.  *Id.* ¶ 3.  Specifically, Relators identify sixteen children who received special education pursuant to an IEP at one of the defendant schools from 2000 to 2010 ("Child A-P").  *Id.* ¶¶ 66-238.  For Child A-P, Relators claim that Defendants failed to do at least one of the following:  (1) provide TCM services beyond the development and implementation of the IEP, (2) assign a case manager to each child for whom the DOE billed Medicaid, (3) hold an IEP meeting thirty days before billing Medicaid for TCM services, (4) notify parents that TCM services were to be provided to their children, and (5) obtain parental consent to bill Medicaid for TCM services.  *Id.* ¶ 63.  Defendants either used software programs, like ClearTrack 200, to automatically bill Medicaid for TCM services, *id.* ¶¶ 54-61, or manually billed for TCM services that were not provided, *id.* ¶ 62.  As a result, Relators allege that Defendants violated the FCA in the following three ways:  (a) by presenting false claims (31 U.S.C. § 3729(a)(1)(A)), (b) by using false statements in connection with a claim (31 U.S.C. § 3729(a)(1)(B)), and (c) by presenting "reverse" false claims (31 U.S.C. § 3729(a)(1)(G)).

Relators' opposition to Defendants' motions to dismiss, however, presents a more nuanced theory of liability.  Relators now claim that TCM services "that would have been

reimbursable to Medicaid are those that would supplement the services already paid for by IDEA

such as, accessing other medical service, financial service, social assistance and the like." *See*

Relators' Opposition to Motions to Dismiss ("Relators' Opp'n"), ECF No. 73, 6 n.1 (citing Am.

Compl. ¶¶ 27, 40-47).  According to Relators, Defendants did not provide any of these services;

rather, they billed Medicaid for IDEA services that were already funded by IDEA grants.  Such

duplicative billing, the argument goes, violates the FCA because multiple federal statutes and

regulations prohibit a school from billing Medicaid for services that already received other

federal funding.  Under either theory, the case largely depends on whether school districts were

permitted to seek Medicaid reimbursement for IEP reviews—without providing additional

services—under federal and state Medicaid laws.

## <u>DISCUSSION</u>

**I.      The Upstate Defendants Are Improperly Joined and Must Be Dismissed**

Defendants are improperly joined in this action and therefore all claims must be severed.

Under Federal Rule of Civil Procedure 20(a)(2), joinder of multiple defendants is proper only if:

> (A)      any right to relief is asserted against them jointly, severally, or in the
> alternative with respect to or arising out of the same transaction,
> occurrence, or series of transactions or occurrences; and
>
> (B)      any question of law or fact common to all defendants will arise in the
> action.

Relators must demonstrate both. *See Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159

(S.D.N.Y. 2009).  Here, there are no allegations suggesting that Defendants can be held jointly or

severally liable for any allegedly false claim made by any other Defendant.  Further, Relators do

not assert a right to relief against the Defendants arising out of the "same transaction, occurrence,

or series of transactions or occurrences."  Relators simply allege that each Defendant submitted

its own Medicaid bills for services provided to its own students.  Joinder is improper where, as

here, "the plaintiff does no more than assert that the defendants merely committed the same type of violation in the same way." *Peterson v. Regina*, 935 F. Supp. 2d 628, 638 (S.D.N.Y. 2013) (internal quotations omitted).[1]  As a result, Relators are not entitled to joinder and their claims against each Defendant must be severed.

Once the claims are severed, Relators cannot establish that venue is proper for the Upstate Defendants.  According to 28 U.S.C. § 1391(b)(2), a civil action may be brought in a district "in which a substantial part of the events or omissions giving rise to the claim occurred."[2] A "substantial part" means that "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (2d Cir. 2005) (emphasis in original).  Here, Relators allege that venue is proper solely because the Upstate Defendants received funds that were transferred by CMS through the Federal Reserve Bank in Manhattan.  *See* Relators' Opp'n at 28-29.  Yet any allegedly fraudulent acts by the Upstate Defendants—the sole events giving rise to Relators' claims—occurred in the Northern District of New York.  While the receipt of federal funds by the Upstate Defendants may be significant, the location of the originating bank for those funds is not.  *See* Taconic Hills Central School District Reply Brief at 3, ECF No. 78.

---

[1] Relators argue that joinder is proper because Defendants claimed reimbursement through the New York State Medicaid Program, which receives federal funding based on CMS quarterly reports sent to the federal government. *See* Relators' Opp'n at 29-30.  Because Defendants' actions caused each report to be false, the argument goes, their false claims are part of the same series of transactions between the State and CMS.  *See id.*  Even if these constitute a "series of transactions," which is unlikely, the transactions are not those that Relators allege give rise to relief.

[2] Venue can also be established in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  28 U.S.C. § 1391(b)(1).  Once the claims are severed, however, the DOE's residency in the Southern District of New York has no bearing on the proper venue for Relators' other claims.

Since all events giving rise to Relators' claims against the Upstate Defendants occurred in the Northern District of New York, venue is only proper in that district.[3]

Accordingly, the Court severs the claims against each Defendant and holds that venue is improper for Relators' claims against the Upstate Defendants. The Court must then determine whether transferring the claims to the Northern District of New York would be in the "interest of justice." *See* 28 U.S.C. § 1406(a). Since Relators fail to state a claim upon which relief may be granted against the DOE, *see infra* Part II, and their claims against the Upstate Defendants are almost identical, transferring would not be in the interest of justice. Pursuant to Federal Rule of Civil Procedure 12(b)(3), the Court therefore dismisses the claims against the Upstate Defendants for improper venue without prejudice.

## II.     Relators Fail to State a Claim Against the New York City Department of Education

### A.     Legal Standard

To state a claim for relief, "a plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Plaintiff must allege "'enough facts to state a claim to relief that is plausible on its face.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all well-pleaded factual allegations and draws all inferences in Plaintiff's favor. *See Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006). When a

---

[3] Despite Relators' argument to the contrary, *see* Relators' Opp'n at 27 n.10, Taconic Hills Central School District did not waive venue. *See* Answer to Amended Complaint, ECF No. 15, ¶ 7; Taconic Hills Central School District's Motion to Dismiss at 5-6.

plaintiff alleges fraud, however, those allegations must meet the higher pleading standard set forth in Federal Rule of Civil Procedure 9(b).  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

Relators allege three causes of action.  The § 3729(a)(1)(A) claim must allege facts showing that the defendant "(1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001).  The § 3729(a)(1)(B) claim must allege that the defendant "(1) created, used, or caused to be used, a record or statement; (2) that is false or fraudulent, (3) knowing of its falsity, (4) to get a false or fraudulent claim paid or approved by the government."  *United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 327 (S.D.N.Y. 2004).  Finally, the § 3729(a)(1)(G) claim must allege that the defendant "(1) made a false statement or created and used a false record, (2) with knowledge of its falsity, (3) for the purpose of decreasing, concealing, or avoiding an obligation to pay the Government."  *Id.*  Thus, for each claim, Relators must allege that the DOE made a false claim or statement to the government and that the DOE knew that it was false.

### B.     Relators Fail To Sufficiently Allege That the Department of Education Submitted False or Fraudulent Claims

"A claim is 'false or fraudulent' if it 'is aimed at extracting money the government otherwise would not have paid.'"  *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 310 (S.D.N.Y. 2011) (quoting *Mikes*, 274 F.3d at 696).  Relators allege that the DOE submitted both "factually false" and "legally false" claims.  A claim is "factually false" if it "involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided."  *Mikes*, 274 F.3d at 697.  A claim is "legally false" if it

rests on a false representation of compliance with an applicable federal statute, regulation, or contractual term. *Id.* at 696. Known as the "legally false certification theory," these certifications can be either express or implied. *Id.* at 698-99. "An expressly false claim is, as the term suggests, a claim that falsely certifies compliance with a particular statute, regulation or contractual term," whereas "[a]n implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.*

### 1.   Factually False Claims

Relators' primary argument is that the DOE submitted factually false claims because it billed Medicaid for TCM services that were never provided. *See* Am. Compl. ¶ 3. According to Relators, federal and state regulations prohibit billing Medicaid for the same services that a school received federal funding for under the IDEA. As a result, the argument goes that school districts may only bill Medicaid for services beyond development and implementation of an IEP. Because the DOE did not provide any additional services, Relators allege that the DOE submitted false claims for Medicaid reimbursement. But Relators misconstrue the applicable legal framework in place during the time period in question.

Federal Medicaid regulations set requirements that a State Medicaid plan must meet to qualify for federal funding. *See, e.g.*, 42 U.S.C. 1396a(a) ("A state plan for medical assistance must . . . ."); *id.* § 1396b (describing payment "to each State which has a plan approved under this subchapter"). Once CMS determines that a State's Medicaid plan meets the federal requirements, each State is responsible for administering the program. *See* About Us, Centers for Medicare & Medicaid Services, http://medicaid.gov/about-us/about-us.html (last visited March 24, 2014) ("The Federal government establishes certain parameters for operation of the

states' Medicaid programs, but each state administers the program . . . ."). States then impose

obligations on healthcare providers, like school districts, to follow in billing Medicaid. *See, e.g.*,

18 N.Y.C.R.R. § 504.3(f) ("By enrolling the provider agrees . . . to submit claims . . . in the

manner specified by the department in conformance with the standards and procedures for claims

submission . . . ."). In other words, States must follow federal Medicaid law, while school

districts must follow state Medicaid law.

Here, the Federal government approved New York State's Medicaid program prior to its

enactment. *See* Langlois Decl., Ex. C. (approving SPA No. 96-41, which defined the types of

reviews that would be reimbursable under the State Medicaid program). It was then up to the

DOH and SED to determine the standards and procedures for claims submission in accordance

with those terms. That is exactly what the State did in establishing rate codes for the following

IEP services:  an initial review, an annual review, an amended/requested review, and a

triennial/re-evaluation review. *See* Langlois Decl., Ex. E at 29; *see also id.*, Ex. D at 19.[4]  These

provisions authorized schools to bill Medicaid for IEP reviews, regardless of whether they

received any IDEA funding. The DOE then used these rate codes to bill Medicaid for IEP

activities that it provided to its Medicaid-eligible, disabled students.

Relators respond that even if the State permitted this, "New York State guidance cannot

and does not contradict federal and state laws that prohibit duplicative billing." *See* Relators'

Opp'n at 3. But any conflict between federal and state Medicaid regulations is the fault of New

---

[4] Although the SSHSP Handbook does not use the term "IEP reviews," that is clearly what it describes. For
example, a "unit of service" includes the "activities leading up to and including the writing of the IEP,"
"[c]onducting and convening the CSE conference to develop the IEP," and "contact by the student's service
coordinator or CSE, with the student's parent or other responsible individual . . . relating to the development of the
initial IEP." *Id.*, Ex. E at 30. Furthermore, for each service, the SSHSP Handbook states that "an appropriate
committee meeting must be convened and appropriate members of the Committee or Subcommittee on Special
Education who conducted the review must have attended the meeting." *Id.*, Ex. E at 29. This is the identical
procedure provided for under the IDEA. *See* 8 N.Y.C.R.R. § 200.4(b). The SSHSP Handbook also requires that the
"four reviews . . . only be claimed on or after the date the IEP review was completed." Langlois Decl., Ex. E at 29.

York State, which set up these billing procedures.  It is not the fault of school districts like the

DOE, which acted in accordance with these billing procedures as required by state law.  The

appropriate remedy here would be for the Federal government to withhold Medicaid funding

from New York State.  Indeed, the Federal government did this on July 30, 2009 when it reached

a settlement with New York State that prohibited school districts from billing Medicaid for TCM

services until the State adopted new billing procedures.  *See id.*, Ex. J.  But it is not appropriate

to hold the DOE liable for submitting a "false claim" when it complied with all applicable

regulations and therefore did absolutely nothing wrong.

Furthermore, it is questionable whether federal law prohibits a school from billing

Medicaid for services that also received IDEA funding.  Notably, the authorities that Relators

cite actually undermine their argument.  For example, the Amended Complaint relies on an

interim federal Medicaid regulation published on December 4, 2007, which would have

eliminated Medicaid funding to States for IEP development activities.  *See* Am. Compl. ¶¶ 19,

23-25; *see also* 72 Fed. Reg. 68077 (Dec. 4, 2007), Langlois Decl., Ex. F.  But this regulation

was subject to a congressional moratorium prior to its effective date and was later rescinded prior

to implementation.  *See* 74 Fed. Reg. 31183 (June 30, 2009), Langlois Decl., Ex. I.  Recognizing

their error, Relators argue that the interim nature to the rule "did not effect [*sic*] the pre-existing

prohibition on duplicative billing."  *See* Relators' Opp'n at 11.  Yet Relators fail to explain why

a new regulation would have been necessary had a "pre-exhibiting prohibition on duplicative

billing" existed.  Such a regulation itself would have been duplicative.

Relators also point to broad prohibitions on duplicative billing in state regulations and the

SSHSP Handbook.  *See* Relators' Opp'n at 15-16.  But these prohibitions merely reinforce

Medicaid's general status as a payor of last resort.  *See* Langlois Decl., Ex. D at F-1; *id.*, Ex. E at

F-1; *see also* 18 N.Y.C.R.R. § 505.16(b)(2). According to the Government, Medicaid's status as a payor of last resort has no bearing on whether the DOE made a false claim with respect to educationally-related services. *See* Letter from Assistant U.S. Attorney Sarah S. Normand to the Honorable Paul A. Crotty at 3, March 14, 2014, ECF No. 87. Title XIX of the Social Security Act warns that nothing in its subchapter should be "construed as prohibiting or restricting . . . payment . . . for medical assistance for covered services furnished to a child with a disability because such services are included in the child's individualized education program." *Id.* at 2 (quoting 42 U.S.C. § 1396b(c)). The Government concludes that "consistent with IDEA and Title XIX of the Social Security Act, a school district may seek reimbursement from Medicaid to pay for [covered] services necessary to ensure the provision of [free appropriate public education] to Medicaid-eligible children with disabilities." *Id.* at 3. For services eligible for reimbursement, "Medicaid reimbursement is not precluded because the school district may also receive IDEA grant funds or because the school district has an independent obligation to ensure the provision of [the IDEA] to children with disabilities." *Id.*

In response, Relators shift gears and now claim that "it is not the fact that Medicaid is generally a payor of last resort that rendered Defendants' acts unlawful, but that Defendants were double-billing." *See* Letter from Robert W. Sadowski to the Hon. Paul A. Crotty, March 20, 2014 at 1-2, ECF No. 89. But, even if the DOE was prohibited from billing Medicaid for services covered by IDEA funding, Relators still fail to allege that the DOE received any duplicative funds. The Amended Complaint merely alleges that "the Federal government provides a block grant to fund the development and implementation of IEPs . . . for school-aged children with disabilities." Am. Compl. ¶ 12. It does not allege, however, that IDEA funding covered the IEP reviews for Child C-L's IEP reviews in full. In fact, the Amended Complaint

13

does not even suggest that the DOE received any IDEA funding or applied it to students' IEP reviews.  This is likely because any IDEA funding the DOE receives cannot cover the full scope of IEP services provided to its students.  *See* 20 U.S.C. § 1411(a)(2)(A)(ii) & (B)(ii) (limiting state IDEA funding for students with disabilities to "40 percent of the average per-pupil expenditure").  Furthermore, Relators submit the statement of a parent from Taconic Hills Central School District who is "familiar with and [has] reviewed the annual budgets of the Taconic Hills School District [and] therefore was aware that IDEA funds paid for IEPs."  *See* Sadowski Decl., Ex. D ¶ 4.  At a very minimum, under Federal Rule of Civil Procedure 9(b), Relators must submit similar allegations as to the DOE's budget and use of IDEA funds.  They have failed to do so.  As a result, even if the DOE was prohibited from billing Medicaid for services covered by IDEA funding—which it was not—Relators still fail to allege any double-billing by the DOE.

### 2.  Legally False Certification

Relators appear to rely on a legally false certification theory in pleading the remaining allegations.  Relators allege that the DOE failed to meet the following programmatic state and federal requirements:  (1) assign a case manager to each child for whom DOE billed Medicaid, (2) hold an IEP meeting thirty days before billing Medicaid for TCM services, (3) notify parents that TCM services were to be provided to their children, or (4) obtain parental consent to bill Medicaid for TCM services.  Since the DOE certified that its TCM services were provided in compliance with "applicable federal and state laws and regulations," *see* Am. Compl. ¶ 14, the argument goes that the DOE submitted a legally false certification.  The question then becomes whether Relators allege that the DOE submitted an express or an implied false certification claim.  Because an express certification "cannot be premised on anything as broad and vague as

a certification that there has been compliance with all 'federal, state and local statutes, regulations, [and] policies," the Court must apply the implied certification theory.  *See United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 652 (S.D.N.Y. 2011).

   As a preliminary matter, Relators cannot maintain a cause of action based on the first (assigning a case manager) and second allegations (holding an IEP meeting 30 days prior to billing).  First, the DOE was not required to assign a case manager to each child for whom it billed Medicaid.  The SSHSP Handbook makes clear that a "service coordinator or CSE, with the student's parent or other responsible individual," may perform the initial, amended/requested, annual, and re-evaluation/triennial reviews.  *See* Langlois Decl., Ex. E at 30; *id.*, Ex. D at 20-21. It is only when a school district bills for ongoing service coordination—a service not reimbursable to the DOE—that "[a] service coordinator must be assigned to the student."  *Id.*, Ex. E at 32; *id.*, Ex. D at 22.  Second, Relators allege that the DOE "failed to hold an IEP meeting thirty days prior to billing Medicaid for TCM services."  Am. Compl. ¶ 63.  But Relators fail to cite to any applicable regulation or statute.[5]  As with the factually false allegations, Relators cannot maintain a cause of action for legally false claims when the DOE appears to have acted in accordance with the applicable State law.

   Relators' remaining allegations regarding parental notification and consent fail to establish a claim under the implied certification theory.  The theory is limited to situations where "the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid."  *Mikes*, 274 F.3d at 700 (emphasis in original).  The plaintiffs had relied on Section 1395y(a)(1)(A) of the Medicare statute, which states that "*no payment may*

---

[5] After a searching review of the Amended Complaint, there is only one citation that even comes close:  the Amended Complaint quotes the requirement that "[a] written case management plan must be completed . . . within 30 days of the date of referral," Am. Compl. ¶ 44 (quoting 18 N.Y.C.R.R. § 505.16(d)(2)(i)).  But, if these two requirements are related, Relators failed to allege so in the Amended Complaint.

*be made* under [the Medicare statute] for any expenses incurred for items or services which . . . are not *reasonable and necessary*." *Id.* at 700-01 (internal quotations omitted) (emphasis added). Since the requirement that the services be necessary was an "express condition of payment," the Second Circuit held that the plaintiffs alleged a false claim under the implied certification theory. *Id.* Here, Relators cite 34 C.F.R. § 300.154(d)(2)(iv)(A) as the basis for the parental consent requirement, *see* Compl. ¶ 17, but it does not condition Medicaid reimbursement on compliance with its terms.[6] In fact, nothing in the regulation mentions Medicaid reimbursement; rather, the regulation focuses on ensuring that services are provided in compliance with the IDEA. *See generally* 34 C.F.R. § 300.154. Thus, Relators cannot assert a false claim based on the DOE's alleged failure to notify parents or to obtain their consent before billing Medicaid.

**C.      Relators Fail To Sufficiently Allege That the New York City Department of Education Acted Knowingly**

Relators also fail to allege that the DOE knowingly submitted false or fraudulent claims. To establish a violation of the FCA, a plaintiff must establish that the defendant acted "knowingly" in presenting or causing to present a false claim for payment, or making or using a false record, or to avoid an obligation to pay. *See* 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B)), & (a)(1)(G). The FCA defines "knowing" and "knowingly" to "mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b)(1). Even assuming federal law prohibited the DOE from billing Medicaid for the development and implementation of IEP reviews, it did so under the exact procedures set up by the State. Indeed, the DOE, as a creation of state law and a grant recipient, was obligated to follow those procedures. *See, e.g.*, 18 N.Y.C.R.R. § 504.3(f) ("By enrolling the

---

[6] Relators also cite to DOH regulation 18 N.Y.C.R.R. § 505.16, which does not include any parental consent requirement.

provider agrees . . . to submit claims . . . in the manner specified by the department in conformance with the standards and procedures for claims submission . . . .").  As a result, it would have been impossible for the DOE to know that billing Medicaid—using rate codes provided by the State and approved by the Federal government—violated federal law.  *See Colucci*, 785 F. Supp. 2d at 316 ("Even assuming the claims submitted by [defendant] were 'false,' given the lack of clarity in the law, it cannot be said that defendants 'knew' the claims were false.").

Furthermore, the alleged facts are insufficient to give rise to a plausible inference that the DOE knowingly submitted false claims.  On the basis of "information and belief," Relators merely allege that the DOE "automatically billed for TCM services without checking to ensure that those services were provided," Am. Compl. ¶ 62, and did "not manually revers[e] a TCM reimbursement claim when appropriate," Am. Compl. ¶ 59.  Such facts hardly suggest that the DOE knew that it was not permitted to bill Medicaid for IEP reviews, and certainly do not "state a claim to relief that is plausible on its face.'"  *See Starr*, 592 F.3d at 321.  As a result, Relators fail cannot establish that the DOE knowingly submitted false or fraudulent claims.

## CONCLUSION

Accordingly, the Court severs the claims against each Defendant and dismisses the claims against the Upstate Defendants without prejudice for improper venue. Transfer of these claims to the Northern District of New York is not warranted under 28 U.S.C. § 1406(a) and therefore the Court declines to do so. Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court also dismisses the claims against the DOE without prejudice. The Upstate Defendants' motion is GRANTED and the DOE's motion is GRANTED. The Clerk of the Court is directed to enter judgment and to terminate this case.

Dated: New York, New York
       March 25, 2014

                                  SO ORDERED

                                  _____
                                  PAUL A. CROTTY
                                  United States District Judge